IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 3, 2004 Session

## STATE OF TENNESSEE v. LEONARD J. YOUNG

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-04017, 00-04018, 00-04019  Jon Kerry Blackwood, Judge**

---

**No. W2002-03012-CCA-R3-DD  - Filed February 9, 2005**

---

The appellant, Leonard J. Young, appeals as of right his conviction and sentence resulting from the 1999 murder of Hillary Johnson.  On August 23, 2002, a Shelby County jury convicted the appellant of one count of premeditated first degree murder, one count of especially aggravated kidnapping, and one count of theft of property over $1,000.00.  Following a separate sentencing hearing on August 24, 2002,  the jury unanimously found the presence of three statutory aggravating circumstances: the appellant had previously been convicted of a violent felony offense, the murder was committed to avoid prosecution, and the murder was committed during the perpetration of a theft.  See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (Supp. 2002).  The jury further determined that these aggravating circumstances outweighed any mitigating circumstances and imposed a sentence of death.  The trial court approved the sentencing verdict.  On November 8, 2002, the trial court entered judgments of conviction sentencing the appellant to death for the murder, sixty years as a violent offender for the especially aggravated kidnapping, and twelve years as a career offender for the theft.  The sentences were ordered to be served consecutively.  The appellant now appeals as of right, presenting for our review the following issues: (1) whether the trial court erred by denying the appellant's motion to suppress; (2) whether the trial court erred by failing to declare a mistrial when as a result of a death in his immediate family he was unable to continue to preside over the trial; (3) whether the evidence was sufficient to establish venue of the murder in Shelby County; (4) whether the evidence was sufficient to support the appellant's conviction of premeditated first degree murder; (5) whether the trial court erred by permitting the State to introduce various photographs of the victim; (6) whether the trial court erred by admitting certain victim impact evidence; (7) whether the trial court's instruction to the jury that the appellant's prior offenses were offenses in which the statutory elements involved the use of violence violated the United States Constitution; (8) whether the evidence was sufficient to support the finding of the (i)(6) aggravating circumstance; and (9) whether Tennessee's death penalty statutory scheme is unconstitutional.  Finding no reversible error, we affirm the appellant's convictions and sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which, GARY R. WADE, P.J., and, THOMAS T. WOODALL, J., joined.

Robert Wilson Jones, Shelby County Public Defender; W. Mark Ward, Tony N. Brayton, and Garland Erguden, Assistant Public Defenders (on appeal); and William Johnson and Diane Thackery, Assistant Public Defenders (at trial), Memphis, Tennessee, for the appellant, Leonard J. Young.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Guilt Phase Evidence

Jessie Cochran met the appellant during the 1990 Christmas holidays. The two became romantically involved and dated until the early part of 1993. In 1992, Ms. Cochran moved to her current residence in Hardeman County, Tennessee. The home is located on a 175 acre wooded lot.

At approximately 9:15 p.m. on November 16, 1999, Ms. Cochran returned home from an exercise class and discovered a man inside her house. When she "started back toward [her] car," the man ran out the back door, calling her name. Ms. Cochran recognized the appellant's voice. The appellant told Ms. Cochran that he was not going to hurt her and wanted to speak with her. As they walked back towards the house, Ms. Cochran observed that the appellant was carrying a sawed-off shotgun "beside his leg."

For the next forty-five minutes, the appellant and Ms. Cochran discussed their families. The appellant also told Ms. Cochran that he had entered her house through the unlocked kitchen door; however, Ms. Cochran insisted that the door had been locked. Thereafter, the appellant stood to leave, thanked Ms. Cochran "for everything that [she] had done for him," and asked her not to call "the law." After the appellant left, Ms. Cochran discovered that her car keys were missing. She then observed the taillights of her red Mercedes, which was being backed out of the garage, and notified the sheriff's department. She subsequently discovered that the appellant had entered her home by breaking a bedroom window. That night, Ms. Cochran went to stay with her step-daughter and did not return home until December 11, 1999. Ms. Cochran's vehicle was recovered in Ashland, Mississippi, twenty-three miles from her home.

The Rice family owned approximately 500 acres of land in Benton County, Mississippi. The property was located just south of Ashland, approximately thirty miles outside of Collierville, Tennessee. A storage building on the property housed trucks, tractors, and several boats. One of the vehicles inside the building, a 1989 Ford Bronco, belonged to Richard Rice of Germantown, Tennessee. Other than Mr. Rice and his father, only the caretaker had access to the storage building.

The keys were kept in the vehicles inside the storage building. The 500 acre piece of property was fenced, and the road leading to the property was blocked by an iron gate which was locked with a chain and padlock. The storage building was approximately one-half mile from the gate and was not visible from the road.

Mr. Rice verified that on November 18, 1999, the Bronco was locked inside the storage building, and the gate to the property was locked. He explained that on the Sunday preceding November 18, he and his son went to the Benton County property to practice "target shooting." Mr. Rice "got about half way home and realized that [he] had left [the guns] in [the Bronco]." The three guns left inside the Bronco were a nine-millimeter pistol, a .22 Weatherby long rifle, and a .410 chrome shotgun. Because the Bronco was locked, Mr. Rice decided to wait until the following week to retrieve the guns.

"Within the next day or so," the caretaker contacted Mr. Rice's father and asked whether he had taken the Bronco. Mr. Rice's father responded that he had not, and, upon learning that the Bronco was missing, Mr. Rice reported the vehicle as stolen. He subsequently discovered that a window in the storage building had been broken and the gate pulled off its hinges. The Bronco was later discovered in midtown Memphis; however, the three guns were missing.

In 1999, the appellant's niece, Virginia Davis, lived at 166 North Evergreen in midtown Memphis. Ms. Davis had not seen the appellant for approximately six years when he arrived at her house in November 1999. The appellant was driving a Ford Bronco. The appellant asked Ms. Davis if she had a car, and she replied that she did not. He also inquired whether Ms. Davis' father still lived in Texas, indicating that he might visit him. The appellant visited with Ms. Davis for approximately forty-five minutes before leaving at 5:00 p.m. Around 7:00 p.m. that evening, Mississippi law enforcement officers arrived at Ms. Davis' residence and asked that she contact them if she again saw the appellant. The appellant returned two days later, but Ms. Davis refused to allow him inside her house. Ms. Davis then contacted the police as instructed. On November 21, 1999, Mr. Rice's 1989 Ford Bronco was discovered by Memphis Police Officer Jeffrey Herbison at 31 North Evergreen, on the same block as Ms. Davis' residence.

In November 1999, Kathryn Crane was employed at the Seessel's grocery store located at 1761 Union Avenue in Memphis. At trial, Ms. Crane identified a receipt from the store, which receipt was dated November 20, 1999. The receipt reflected the purchase of cranberries, onions, bread, cheese, Sara Lee meat, Cokes, and other various items totaling $44.34. Payment was made with a debit card. According to the receipt, the purchaser "put in $64.34 as the total" in order to receive $20.00 in cash.

In August 1999, the twenty-four-year-old victim, Hillary Johnson, a native of Chicago, received a teaching fellowship in the Philosophy Department at the University of Memphis. Upon arriving in Memphis, the victim purchased a white Hyundai for $1,350. On November 19, 1999, the victim informed her mother, Nancy McPike, that she planned to drive home to Chicago for the Thanksgiving holiday. Two days later, Mrs. McPike attempted to telephone her daughter to no avail.

Michelle Naef, a fellow graduate student, had planned to meet the victim that morning and discuss their grading methods. The victim never contacted Ms. Naef. Later that day, the victim's boyfriend telephoned Mrs. McPike to inform her that he had been unable to contact the victim. Mrs. McPike told the young man, "[I]f you haven't reached her later on, give me a call." At 10:30 p.m. that evening, he telephoned to inform Mrs. McPike that he had been unable to locate the victim. Concerned about the victim's whereabouts, Mrs. McPike contacted the police. She also contacted the victim's landlords and asked if they would allow the police to enter the apartment. In addition to the victim's family and the police, the victim's friends began looking for her.

On November 22, 1999, Memphis Police Officer Kyatonie Jones received a missing person report from Nancy McPike. Mrs. McPike related that the victim lived at 235 South McLean, No. 11. Officer Jones sent another officer to the apartment to investigate. As a result of the officer's investigation, Officer Jones issued a "missing-person's broadcast on [the victim]."

In November 1999, Rick Marlar, a lieutenant with the Mississippi Highway Patrol, was assigned to the Criminal Investigative Bureau. Lieutenant Marlar, as well as other Mississippi Highway Patrol officers, were involved in the search for the victim. On November 29, the officers learned that the victim's vehicle had been located in Tippah County, Mississippi. Lieutenant Marlar proceeded to the location, which "was off in a rural county road area - very rural area - wooded area - pine trees, oak trees . . . - there was also a house that might have been a hunting cabin at one time or an old house place." No evidence of blood was discovered in the victim's car. A search of the "cabin" revealed opened cans of food in the kitchen, a ladies jacket in the living room, and what appeared to be blood on some bedsheets. These stains, however, turned out to be deer blood and paint. During the search of the cabin and surrounding area, Lieutenant Marlar learned of Jessie Cochran, who lived in the adjoining town just over the state-line in Tennessee. Ms. Cochran's residence was approximately fifteen miles from the location of the victim's vehicle if traveling by road, but only two miles if "cutting through the paths through the woods." Lieutenant Marlar received permission from his superiors and the Hardeman County, Tennessee Sheriff's Department to enter the state of Tennessee. A Hardeman County sheriff's deputy accompanied Lieutenant Marlar to Ms. Cochran's residence. A partially filled bottle of Diet Coke and a plastic Seessel's shopping bag were discovered in the woods between the "cabin" and Ms. Cochran's residence.

The officers approached Ms. Cochran's residence on foot, leaving their vehicles parked on the main road. As Lieutenant Marlar reached the front porch, he looked through a window and observed a "gentleman[, later identified as the appellant,] sitting there watching TV, and it was like a deep freeze directly in front of him, and the TV was kind of to his left. And on the deep freeze was a nine-millimeter pistol." When the appellant looked up, Lieutenant Marlar pointed his weapon at him and ordered him to freeze. The appellant moved toward his gun, but Lieutenant Marlar cocked his weapon and told the appellant he would shoot. Eventually, the appellant raised his hands and placed them behind his head. Lieutenant Marlar and the other officers then entered the residence. However, the appellant refused to comply with their instructions and was forced to the floor. Lieutenant Marlar discovered a .22 caliber pistol and a filet knife on the appellant's person. The appellant was arrested and advised of his constitutional rights.

-4-

Upon being questioned by police, the appellant admitted that he had entered Ms. Cochran's residence through a window and had taken her Mercedes. He stated that he had evaded police and hid in the woods for two days. The appellant then came upon the storage building in the woods where he discovered the Ford Bronco. After taking the Bronco, the appellant traveled to Texas, stopping to see his sister and niece in Memphis. He subsequently returned to Memphis and abandoned the Bronco near his niece's residence. The appellant stated that after his niece informed him that the "law" was looking for him, he "[t]ook off running." Shortly thereafter, he encountered a girl in a white Honda at a stop sign. The appellant "jumped in the car, brought her on 64 highway, put her out between the last subdivision and the store." The appellant claimed that, although he had two guns in his boots, he did not use the weapons to gain entrance to the vehicle. When the appellant jumped into the car, the girl asked him not to hurt her. The appellant replied, "I ain't go[ing to] hurt you lady, all I want to do is g[e]t away." The appellant described the girl as "[k]ind of big girl, brown headed," with short hair. The appellant stated that prior to "put[ting] her out" he took some of her credit cards. He then drove through Alabama to Florida, back to Alabama, arriving at Ms. Cochran's residence four days later.

While being detained at Ms. Cochran's residence, the appellant signed a waiver of rights form. He was informed by Mississippi law enforcement officers of charges pending against him in Mississippi. He was advised that he had a right to refuse to return to Mississippi, and that the officers could then extradite him. The appellant was further advised that he could sign a waiver of extradition and the officers could transport him immediately to Mississippi. The appellant signed the waiver of extradition and was taken into custody by Sheriff F.D. Buddy East of Lafayette County, Mississippi.

At the Lafayette County Jail, the appellant was placed alone in a cell. He had access to a television and a pay telephone. On November 30, 1999, Memphis Police Sergeant Gerald Blum and his partner, Sergeant C.W. Cox, traveled to Oxford, Mississippi, to question the appellant regarding his involvement in the victim's disappearance. The appellant advised Sergeant Blum that he approached the victim's car in midtown Memphis. Armed with two pistols, he entered the car and forced the victim to drive around the city and then along Highway 64. Eventually, he released the victim and drove away. When Sergeant Blum asked the appellant about what he should tell the victim's family, the appellant responded, "Tell them I'm not the one that hurt her. . . . Well, if she's hurt."

On December 3, 1999, Special Agents C.M. Sturgis and Joseph N. Rinehart from the Federal Bureau of Investigation (FBI) in Memphis arrived at the Lafayette County Jail to interview the appellant.[1] The agents were met by the appellant's attorney and Sheriff East and taken to the appellant's cell. The appellant was the only inmate confined to the area, and during the interview he and the agents sat at a picnic table in the common area outside his cell. Prior to questioning, the

---

[1]The FBI became involved in the investigation upon discovering that the offenses had crossed state lines and that the victim's credit card had been used in Alabama, Georgia, and Florida after she was reported missing.

appellant was verbally advised of his rights and indicated that he was willing to speak with the agents. Thereafter, the agents watched television and discussed general topics with the appellant. The appellant was free to move about the common area and spent much of the time watching a football game on the television. The appellant was also provided coffee and food. After the appellant ate dinner, Agent Sturgis took some photographs of the victim from an envelope and laid them on the picnic table, remarking that "she was such a pretty child, and it's just a shame that we can't find her." The appellant ignored the photographs and returned to his cell. Shortly thereafter, he returned to the table, tapped Agent Sturgis on the chest, and said, "Basically, I'm fixin' to give you something." He asked for a pen and on the back of the envelope

> he drew a little area - looked like an S curve. And then a round area.
> And he started describing a field that was ten to fifteen acres of four-
> inch, winter-wheat crop that had been planted; that there was a brush
> pile directly in - as you pulled in on the cut-in - a little gravel road off
> the . . . paved road – that there would be a cropping of trees to your
> left, that there would be a large agricultural fuel tank past the trees
> that was silver-colored but rusting; and that, "Next to that, under two
> pieces of tin, you will find what you're looking for."

This information was relayed to other officers, but the officers were unable to locate the area described by the appellant.

Later that evening, after an exhaustive attempt by the appellant to explain where the victim's body was located, Sheriff East suggested that they place the appellant in a patrol car and allow him to direct them to the location of the body. With the appellant directing him, Sheriff East drove

> from Oxford to Olive Branch to - up No. 7, up into Tennessee,
> crossed 72, and on up . . . in Tennessee. . . . [W]e went straight up 7,
> crossed 72 highway, and kept going. We turned up there to the left
> like we was going to Somerville.
>
> . . . .
>
> We was in Marshall County. We left Lafayette and went into
> Marshall, and then we went to Fayette County, Tennessee, I think.

Sheriff East stated he "had no earthly idea where [he] was." It began to rain and was very dark. Sheriff East explained that he "kept driving around and missing a road that was hard to find." Finally, the appellant instructed Sheriff East to drive "real slow." After taking "another little turn, the appellant instructed Sheriff East to drive off the blacktop into a field. The appellant then stated, "Right out there to the left under a piece of tin." Approximately two and a half hours after leaving the Lafayette County Jail, the officers discovered the victim's body beside the piece of tin as described by the appellant.

Darren Goods, a Memphis Police Officer assigned to the FBI Safe Streets Task Force, was assigned to the investigation into the disappearance of the victim. Officer Goods and his partner, Chad Golden, were alerted that the victim's vehicle had been located in Mississippi. The officers went to Mississippi to escort the vehicle to Tennessee.

On December 4, 1999, Sergeant Blum returned to the Lafayette County Jail to interview the appellant. During this interview, the appellant stated that he had taken a Bronco and driven to Texas. Upon returning to Memphis, his niece advised him that the police were looking for him. The appellant left the Bronco parked on the street and began walking. As he crossed the street, a girl drove up and asked him a question. The appellant stated, "I jumped in the car with her[,] . . . told her [I] needed a way to get out of town and . . . took her and her car, out of town. I dumped her off out there in Shelby County and I hid her body under some tin." The appellant admitted that he had two weapons on his person, but stated that they were concealed in his boots. He advised the girl that he was not going to hurt her, and she did not fight or resist. The girl told the appellant that she was from Chicago and "asked where [he] was from." The appellant admitted that he was responsible for the victim's death, but claimed that he was unable to recall how her death occurred. He stated that, at some point, the victim pulled a knife from behind the seat and he had to disarm her. During the altercation, the victim "got cut." The appellant stated that he dragged the victim twenty yards, during which time the victim was moving. The appellant claimed that as he placed the victim under the piece of tin, he "had to move her and her pants slid down to her knees . . . ." The appellant drove away in the victim's car.

At 2:00 a.m. on December 4, 1999, Mrs. McPike received a telephone call from the Midwest Bureau of the FBI. Mrs. McPike learned that her daughter's body had been discovered. Two days later, Mrs. McPike attended a memorial service for her daughter at the University of Memphis.

Dr. O.C. Smith, the Shelby County Medical Examiner, performed an autopsy on the victim's body. Dr. Smith initially responded to the location where the body was discovered. Dr. Smith described the scene:

> She was lying on her back. She was wearing a brown sweater, had green cargo-type trousers that were present down about her ankles, and there had been some muddy soiling to her skin, and there had been some recent animal activity as well.

Thereafter, the victim's body was taken to the forensic center for further examination. Dr. Smith described the examination as follows:

> The examination of Ms. Johnson's body was significant for the findings of bruises that were about her right orbit – . . . bruises on the right side of her neck; three bruises – three round bruises along the line of the left jaw . . . ; bruises on her left chin, and on the back of the right thigh.

There were also indications of a stab wound in the clothing – upper body clothing - the brown sweater at the left back just below the neckline, and that was adjacent to a stab wound found in the same position on her back, which was in the left upper back about 55 inches above the heel and 3.4 inches to the left of the centerline of the body.

. . . X-rays indicated that there was a retained knife blade present in her left chest cavity. At autopsy, the surgical incisions revealed the presence of that knife blade going through the skin and the subcutaneous tissues. It went between the third and fourth ribs on the left side. It went through the left upper lobe of the lung. It went into and out of the aorta, which is the largest artery in the human body. The maximum measured depth of penetration was 5.77 inches . . . into her body.

. . . .

The wound itself was responsible for the production of a condition known as a hemathorax in which blood collects in the chest cavity on the left side of the body. That accumulation of blood compressed the left lung. It also pushed organs of the chest over to her right side. This is a condition which can cause interference with the heartbeat by interfering with the flow of blood to and from the heart as well as the damage to the lung itself as well as the compression of the lung.

. . . .

The right lung was affected . . . by a condition known as pulmonary edema. When the person goes into shock, when a heart begins to fail, the air sack in the lung can fill up with fluid. And so she had a finding of pulmonary edema on the right lung as well.

And additionally . . . examination of the genital area showed that there were two blue fibers recovered from the immediate genital region.

Dr. Smith opined that the bruising to the victim's person occurred less that two hours prior to her death. He further concluded that the victim lived only a matter of minutes after receiving the knife wound. Dr. Smith concluded that the death of Hillary Johnson was the direct result of the knife stab wound to the back.

Based upon the foregoing evidence, the jury convicted the appellant of first degree premeditated murder, theft of property over $1,000, and especially aggravated kidnapping.

**Penalty Phase Evidence**

During the penalty phase, the State presented the testimony of Dr. Ronald Sundstrom, a professor of philosophy at the University of Memphis. Dr. Sundstrom testified that the victim was his teaching assistant and a graduate student in the philosophy department. He explained that as his teaching assistant, the victim was in charge of one-third of his students. The victim's responsibilities included grading papers, teaching discussion sessions with the undergraduate students, and counseling students. Dr. Sundstrom related that the victim's murder had a "tremendous" impact on the undergraduate students she "mentored," her associate graduate students, and the faculty. Many students were unable to finish the semester, and the entire philosophy department "ground to a halt." One student "dropped out."

Nancy McPike, the victim's mother, testified that the entire family continues to suffer as a result of her daughter's murder. Mrs. McPike related that the victim's brother had difficulty in school and the victim's father had been unable to continue in his endeavors to start a new business. Moreover, at the time of the victim's disappearance, Mrs. McPike was completing an undergraduate degree in philosophy and found it difficult to finish. Although she was in graduate school at the time of trial, she had been unable to complete certain courses as a result of being unable to focus. Mrs. McPike related that prior to the victim's disappearance, the victim had fought with her best friend, and her friend was distraught because she can never make amends with the victim. According to Mrs. McPike, the friend had sought therapy and admitted herself to a hospital, fearing she would take her own life. Mrs. McPike further testified that two of the victim's former boyfriends found it difficult "to cope with her death," and the victim's aunts, uncles, and grandmothers "all struggle[d] to understand how to get up each day and go on without [the victim]."

The State also presented the testimony of Joe Warren, a criminal court clerk, regarding the appellant's prior felony convictions. The clerk's files reflected that on June 24, 1974, the appellant pled guilty to three counts of robbery with a deadly weapon. On June 11, 1974, a jury convicted the appellant of rape, and the appellant pled guilty to robbery with a deadly weapon. Sandra Young, a fingerprint technician with the Records and Identification Division of the Shelby County Sheriff's Department (R & I), testified that at the State's request she obtained prints of the appellant's fingers and compared them to the prints contained in R & I file number 311474, which file belonged to the appellant. The prints were a match. Mary Alice Busby, the Circuit Court Clerk of Lafayette County, Mississippi, presented clerk's files reflecting that on July 19, 2001, a jury convicted the appellant of one count of kidnapping and on October 20, 2001, although indicted for capital murder, the appellant pled guilty to one count of manslaughter.

James Allen Nault, a resident of Oxford, Mississippi, who at the time of trial was confined in the Marshall County Correctional Facility, testified that on November 15, 1999, he was preparing for work when he heard his wife scream. He ran outside and observed the appellant attempting to

force his wife into a car. Mr. Nault ran toward the appellant until the appellant pointed a shotgun at him and ordered him to stop. As Mr. Nault's coworker turned to run, the appellant again "drawed the shotgun up and said he was gonna kill that F-ing punk because he didn't like him anyway because they had problems." The appellant said that he wanted Mr. Nault's wife "to take him off." Mr. Nault told the appellant, "No, you take me. You ain't taking my wife." Mrs. Nault handed the car keys to her husband. Both men got into a 1997 Lumina, Mr. Nault in the driver's seat and the appellant in the passenger seat. With the shotgun aimed at Mr. Nault's head, the appellant ordered Mr. Nault to drive to Pea Ridge Road. Apparently, the appellant knew Mr. Nault's mother-in-law, because he told Mr. Nault to tell her that he "blew her house up, which he did – he blew it up in Water Valley. And he said, 'Tell her I'm coming back, and I'm gonna take her down to Turner Road, and I'm gonna blow her head off.'" Eventually, the car ran out of gas. The appellant abandoned the vehicle and walked into the woods.

Buddy East, the Sheriff of Lafayette County, Mississippi, testified that as a result of the kidnapping of Mr. Nault, he learned that the appellant had threatened to harm William Bramlett. Sheriff East immediately ordered deputies to locate Mr. Bramlett. Upon locating Mr. Bramlett, the deputies advised him of the appellant's threats and continued to search for the appellant to no avail. The following morning, Mr. Bramlett was reported missing by his sister. On November 17, 1999, Mr. Bramlett was found dead in his trailer. Mr. Bramlett had been shot in the back of the head with a .22 caliber pistol. His pickup truck was later discovered in Hardeman County, Tennessee, three miles from Jessie Cochran's residence.

The defense presented no testimony.

At the close of the proof, the jury was instructed on the following statutory aggravating circumstances:

> No. 1. The defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crimes of robbery first-degree, robbery with a deadly weapon, kidnaping, manslaughter, and rape, which are felonies, the statutory elements of which involve the use of violence to the person.
>
> No. 2. That the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.
>
> No. 3. The murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit or was fleeing after having a substantial role in committing or attempting to commit theft.

-10-

<u>See</u> Tenn. Code Ann. § 39-13-204(i)(2), (6), (7).

The jury was also instructed that it should consider:

> Mitigating Circumstances. Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include but are not limited to the following:
>
> No. 1. Any testimony that he was cooperative in assisting to find the victim's body, thus allowing the family to give her a proper burial.
>
> No. 2. Any testimony he cried showing remorse when he arrived at law enforcement office in Fayette County to recover the victim's body.
>
> No. 3. Any testimony showing that he only has a third-grade education.
>
> No. 4. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant, which is supported by the evidence. No distinction shall be made between the mitigating circumstances listed and those otherwise raised by the evidence.

At 9:05 p.m., following submission of the instructions, the jury retired to consider the verdict. Deliberations continued until midnight and resumed at 10:00 a.m. the following morning. At 11:10 a.m., the jury returned its verdict, finding that the State had proven the aggravating circumstances (i)(2), the defendant was previously convicted of one or more violent felonies other than the present charge; (i)(6), the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another; and (i)(7), the murder was committed during the perpetration of a felony. The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. In accordance with their verdicts, the jury sentenced the appellant to death for the premeditated murder of Hillary Johnson. The appellant now brings this appeal.

### I. Suppression of Statement

Prior to trial, the appellant filed a motion to suppress his statements to Memphis police officers. As grounds for his motion, the appellant asserted that the statements were not given freely and voluntarily and were taken in violation of his right to counsel.

## Facts Developed at the Suppression Hearing

At the suppression hearing on July 22, 2002, FBI Special Agent C.M. Sturgis testified that he interviewed the appellant on December 3, 1999, while the appellant was in custody in Oxford, Mississippi. The appellant was in custody on a warrant relating to the murder of William Bramlett, which murder occurred in Lafayette County, Mississippi. Agent Sturgis went to Oxford to question the appellant about his involvement with or knowledge of "a missing college student, Hillary Johnson, from the University of Memphis."

At the time of the interview, Agent Sturgis knew that the victim's credit cards had been used out of the state, the victim had been listed as missing by the Memphis Police Department, and the victim's vehicle had been recovered in Tippah County, Mississippi. The appellant had been apprehended approximately four miles from where the victim's car was recovered. The appellant had previously admitted to Memphis police officers that "he had carjacked [the victim], that he had driven out Highway 64 somewhere near the county line, meaning Fayette County[, Tennessee]. He had dropped her off at the end of a road and had proceeded on and he had left her there." Agent Sturgis hoped that additional information could be gleaned from the appellant.

When Agent Sturgis and Agent Rinehart arrived at the jail, they were met by Sheriff East and the attorney appointed to represent the appellant on the charges pending in Mississippi. The attorney agreed that "as long as [the agents] did not discuss [the charges pending in Mississippi] . . . that it would be okay to go in if [the appellant] was willing to speak with [the agents.]" At approximately 2:00 p.m., the agents were taken to a holding area outside the appellant's cell. Agent Sturgis testified that the area in which the appellant was confined

> had three individual cells. He was in the middle cell. All of the doors were unlocked and opened and there was a common area where you could sit that had a stainless steel picnic table. There was a television mounted on the wall, a pay phone, a shower, and rest room area.

According to Agent Sturgis, the appellant "seemed to be okay. He didn't seem like he was in any kind of health problems or miserable . . . ." The agents asked the appellant if he was willing to speak with them and advised him of his rights. The appellant agreed to speak with the agents, advising them that "he had just come from court on the Bramlett case" and "the judge had gone over his rights at length with him." The appellant never indicated that he did not understand his rights or that he had trouble hearing.

Thereafter, the agents and the appellant watched television. The appellant periodically went from his cell to the picnic table where he would sit with the agents. They discussed the appellant's carpentry skills and the fact that he had recently lost a thumb. Eventually, Agent Sturgis pulled out an envelope containing childhood photographs of the victim. He removed the photographs from the envelope and placed them on the picnic table. The agents remarked that they would like to find the victim's body and asked the appellant if he would help them.

-12-

The three men continued their conversation, discussing the appellant's past relationships, his education, and his prior periods of confinement. The appellant had a lengthy criminal history, spanning forty years. The appellant never requested an attorney and never indicated that he was tired or wanted to leave. During the interview, the appellant was served dinner and permitted to smoke a cigarette, although smoking in the jail was prohibited.

Thereafter, the appellant returned to his cell. When he returned to the table, he tapped Agent Sturgis on the chest and said, "I'm fixing to give you something." He then proceeded to draw a map on the back of the envelope which had contained the photographs of the victim. The agents relayed the information to investigators, but the investigators were unable to find the area described by the appellant. Eventually, the appellant agreed to ride with the agents and direct them to the location of the body. They left the Oxford jail at approximately 10:30 p.m. During the drive, the appellant never indicated that he no longer wanted to help the officers locate the victim's body or that he wanted to return to the jail. Agent Sturgis testified that when they located the body at approximately 1:20 a.m., the appellant "broke down and was very upset about what all had happened." Although unable to recall the murder, the appellant stated that "if she was laying there dead, that he guessed he did it." He further admitted that he had encountered the victim in midtown Memphis.

The next day, Memphis law enforcement officials contacted Agent Sturgis and inquired whether the appellant would be willing to provide a recorded written statement. Agent Sturgis offered to return to Oxford to ask the appellant if he would provide another statement.

Memphis Police Sergeant Gerald Blum testified that he and his partner, Sergeant Cox, first interviewed the appellant on November 30, 1999. The officers traveled to the Lafayette County Jail in Oxford, Mississippi, to interview the appellant as a potential suspect in the victim's disappearance. At 1:35 p.m. that afternoon, the officers advised the appellant of his Miranda rights, which were read to him from the Memphis Police Department advice of rights form. The appellant informed Sergeant Blum that he understood his rights, but he could not read or write and, although he was willing to talk with the officers, he refused to sign anything. The appellant then told the officers that he was the person responsible for carjacking the victim. He stated that he drove the victim "out off of Highway 64 and let[] her out of the car." After interviewing the appellant for more than an hour, Sergeant Blum "[t]ook a break." During the break, Agent Sturgis advised Sergeant Blum that the appellant had been positively identified as a robbery suspect in Alabama. Based upon this information, Sergeant Blum decided to question the appellant regarding the "course of [his] travels during that time." At 6:48 p.m., Sergeant Blum resumed his questioning of the appellant and again advised the appellant of his rights. During this interview, Sergeant Blum asked, "[I]f we find Ms. Johnson's body and it's determined there was foul play involved, who would be responsible and he said only me." The appellant also admitted to taking the victim's vehicle and traveling through several southern states. The second part of the interview concluded at 9:50 p.m.

Sergeant Blum recalled that during the interview, the appellant did not appear to be under the influence of any drugs or alcohol. Sergeant Blum also stated that neither he nor anyone in his presence threatened, coerced, or made promises to the appellant. Moreover, the appellant never

requested an attorney. However, the appellant informed the officers that he had completed only the third grade and could not read or write.

Sergeant Blum testified that on December 4, 1999, he returned to Oxford to question the appellant. Sergeant Blum was taken to an interview room where the appellant's statement was to be tape recorded. The appellant was again advised of his rights and, this time, the appellant signed the advice of rights form. According to Sergeant Blum, the appellant appeared to be in good condition, calm, cooperative, and not under the influence of any drugs or intoxicants. During the interview, the appellant did not indicate that he wanted to terminate the interview or that he wanted counsel. The interview lasted approximately one hour.

In his recorded statement, the appellant admitted that while "runnin' from the law out of Mississippi," he stole the Bronco and drove through Memphis to Houston, Texas, and back to Memphis. While in Memphis, he visited his niece, who informed him that the police were looking for him. Thereafter, the appellant parked the Bronco on the street near his niece's apartment in midtown and "started walkin'." As he walked across the street, a girl in a white, four-door car stopped and asked the appellant a question. The appellant jumped in the passenger side of the vehicle and told the girl that he "wasn't gonna hurt her, all [he] needed was a way to get out of Shelby County." The appellant related that when he jumped into the car, he had two guns in his boots, one of which was the nine-millimeter pistol taken from the Bronco.

The appellant stated that after driving several blocks, he and the victim "switched places," and he drove "east 'till we got to Airways. When we got to Airways, I knowed where I was at then. We went to Airways around to [Interstate] 240. I went around Memphis to [Interstate] 40 going to Nashville and hit [Highway] 64 while I was going out that way." The appellant stated that he "dumped [the victim] off out there in Shelby County and . . . hid her body under some tin."

In his statement, the appellant claimed that although he was responsible for the victim's death, he was unable to recall how she died. However, he related that while "in the woods," the victim pulled a knife from behind the seat. He grabbed her arm and took the knife from her. The appellant stated, "I think she got cut." The appellant then dragged the victim's body to a field and placed her under "some tin." After hiding the victim's body, the appellant took her car and drove to Alabama, Florida, and back to Mississippi. He used the victim's credit cards to finance his trip.

The fifty-seven-year-old appellant testified at the suppression hearing that he had completed only the first grade. When he was twelve years old, he was placed in a school for boys, but was subsequently forced to leave because his father needed him to work in the fields. The appellant testified that he could not read or write. He related that while in the Lafayette County Jail he was questioned by approximately sixteen or eighteen law enforcement officers within a five-day period. According to the appellant, the officers failed to identify themselves and questioned him "[d]ay and

night, day and night." The appellant maintained that during the interview process, he was threatened physically by a Memphis police officer and was confined to his cell. When taken to the "sally port" to smoke a cigarette, the appellant was placed in leg irons, handcuffs, and waist chains and guarded by "attack dogs."

The appellant conceded that he understood some of the rights that were read to him; however, he was unable to recall signing the advice of rights form. In fact, he maintained that he "ain't signed nothing." The appellant claimed that during the interview, he advised the officers that he was finished speaking with them, but the interview continued. The appellant also claimed that when he requested an attorney, Sheriff East brought an attorney to the door and said, "[T]his is the attorney we are going to appoint you." The appellant testified that "the man left and I ain't ever seen him since, not nary time since then." Regarding his alleged cooperation, the appellant stated, "I tried to be as [cooperative as] I could . . . to keep from getting the hell beat out of me." The appellant further averred that he never agreed to physically direct the officers to the location of the victim's body. Rather, he was chained and placed in a patrol car. According to the appellant, the trip to Tennessee and then to Mississippi was without his consent. On cross-examination, the appellant admitted that he had prior convictions of robbery with a deadly weapon, rape, crime against nature, grand larceny, kidnapping, habitual criminal, and manslaughter.

Based upon this proof, the trial court made the following findings of fact and conclusions of law:

> [T]here is ample proof in my judgment that the FBI Agents Sturgis and Rinehart gave Mr. Young his rights. Even Mr. Young conceded in his testimony, his sworn testimony today that he was advised of his rights orally. He does not remember them actually reading from a document the rights, but he does remember having been advised of his rights and concedes that he understood most of them.

> We didn't get into or the questioning didn't get into exactly what he claims he did not understand but he concedes that he understood most of them. That's from his testimony. Certainly from the testimony of the agents, he was fully advised of his rights and appeared to fully understand his rights prior to giving the oral statements that they took from him and prior to going with them up to Tennessee and the continuing statements that he provided in helping them locate the body. So I don't have any qualms about determining that he had been fully advised of his rights by the FBI agents prior to cooperating with them, giving them the oral statements that he gave and the statements that he gave in the process of helping to locate the body.

-15-

In fact, the whole history of the statements that he gave would indicate a pattern of cooperation, a pattern of initially giving self-serving statements that then evolved into more incriminating statements. He first told the police even before the agents went down there that he had kidnapped the victim but had let her out at that intersection on Highway 64. And last time he saw her she was alive. That was his initial statement. So that would indicate a self-serving statement that would certainly indicate a statement freely and voluntarily given.

And of course, when trying to view what Mr. Young is now claiming happened against what the officers claim happened, one has to evaluate the credibility of the various witnesses, and I find Mr. Young's credibility not to be very good given his prior record and the motive he would have today to shade things in his favor.

With regard to whether he was advised of his rights by Officer Blum and whether he freely and voluntarily gave the statement to the Memphis Police Department, again, he was advised of his rights first on November 30 at 1:35 p.m. That was the time that he was read his rights but refused to sign. That's consistent with all that was presented. And then again on December 4th, when he was read his rights and did sign. Then provided the lengthy taped statement. There are several indications at the beginning – the tape itself has not been introduced into evidence, but the statement indicates that in the heading it was stated that this taped statement is made on Saturday, December 4th, 1999, in the Fayette County jail, Fayette County, Mississippi. I assume that means LaFayette County, 1611 hours to Sergeant Blum and Sergeant Cox.

Farther down that first page, Question: Mr. Young, are you aware that we are recording this tape? Answer: Yes. Second page - - well, after his rights are read to him again, they ask him: If you don't mind speaking up and saying yes instead of shaking your head. Answer: Yes. Which would again indicate that he knew it was being taped. And then later in the statement where Sergeant Blum indicates that he's turning the tape over to side B and asking Mr. Young to repeat his answer, would further indicate that he knew that the matter was being taped. I don't think it's any question. He knew it was being taped. He was freely and voluntarily giving the statement.

In fact some of his answers, some of his responses – all of his responses in here would indicate an individual who was cooperating and freely and voluntarily giving the statement. And as an example, of course I had noticed the portion . . .where he said he wanted to apologize for giving the police a hard time the other day. That would certainly indicate an individual who was not being coerced to say anything but was voluntarily cooperating and giving the statement.

And then on Page 17 where he was asked: Why did you decide to take them to that location? Answer: I wanted her to be with her family for Christmas and get this over with. It was eating me up. It was eating me alive.

To me that indicates a person that's voluntarily providing this information, has a real, an overwhelming feeling of guilt. It was eating me up. It was eating me alive. He wants to unburden himself and provide this information and does not indicate an individual who is being coerced or beaten or forced in anyway to give this statement.

I think everything about the testimony I've heard and the documents that have been introduced suggest that all these statements and all these actions were provided freely and voluntarily after he had been fully advised of his rights on numerous occasions. And I'll deny the motion to suppress in every regard.

On appeal, the appellant contests the trial court's denial of his motion to suppress, arguing that his testimony reflects that his confession was coerced and that his request for counsel was never honored. The State responds that the trial court properly denied the appellant's motion to suppress.

A defendant's right against compelled self-incrimination is protected by both the United States and Tennessee Constitutions. U.S. Const. amend. V; Tenn. Const. art. I, § 9. As our supreme court has explained:

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning

-17-

> that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). However, these rights protected by Miranda may be waived by an accused if the waiver is made voluntarily, knowingly, and intelligently. Id. Whether a waiver has been made voluntarily, knowingly, and intelligently must be determined by the totality of the circumstances surrounding the interrogation. State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993); State v. Benton, 759 S.W.2d 427, 431-32 (Tenn. Crim. App. 1988).

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates otherwise. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001) (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. Odom, 928 S.W.2d at 23. On appeal, the prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to the facts, however, is subject to de novo review. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. State v. Buck, 670 S.W.2d 600, 610 (Tenn. 1984).

In the instant case, the trial court accredited the testimony of Memphis Police Sergeant Gerald Blum and the FBI agents and found that the appellant had not been coerced into giving his statements. The trial court noted that Sergeant Blum testified, and the appellant conceded, that he had advised the appellant of his rights prior to questioning on both November 30, 1999, and December 4, 1999. The trial court further noted that although the appellant refused to sign a waiver at the interview on November 30, 1999, he subsequently executed a written waiver on December 4, 1999, and provided a "lengthy taped statement." The transcribed statement reflects that the appellant was advised of his rights, claimed that he understood his rights, and acknowledged that he was aware that his statement was being recorded on audiotape. Moreover, contrary to the appellant's testimony, both Sergeant Blum and Agent Sturgis testified that the appellant never requested an attorney. Although the appellant had a limited education, he had a history with the criminal justice system that spanned forty years. Based upon these facts and circumstances, the trial court found that the appellant was "cooperative and freely and voluntarily g[ave] the statement[s]." The evidence does not preponderate against the findings of the trial court. Accordingly, we conclude that the trial court committed no error in denying the appellant's motion to suppress.

## II. Failure of Trial Court to Declare Mistrial

After jury selection and opening statements, but prior to the State's case-in-chief, a death occurred in the immediate family of Judge Joseph B. Dailey, the presiding judge. In light of this occurrence, Judge Dailey informed the parties,

> [T]here's simply no way I can proceed with this trial this week under these circumstances.

> And in my judgment, these circumstances clearly qualify under Rule 25[.] . . . [I]n my judgment, these circumstances fall into the "other disability" category; that make it impossible for me to proceed as the presiding judge in this trial given the closeness of the family member and the unexpected nature of her death and the – all of the arrangements are being made for a funeral that will be two days from now. It is impossible for me to proceed in this case as the presiding judge.

> So, again, pursuant to Rule 25, I have located Judge Kerry Blackwood from Somerville who is available to come and try the case. He's been assigned to the court by the Supreme Court – by the AOC and the Supreme Court pursuant to Rule 25. And upon his arrival, he will familiarize himself with the case. . . . And upon completion of that, he will certify that he is sufficiently familiar with the record of the trial to proceed with and finish the trial.

> All of that is contemplated under Rule 25, and all of the procedures set out in Rule 25 have been complied with and will have been complied with at the time that Judge Blackwood certifies that he's ready to proceed with trial.

Prior to commencing with the trial, Judge Blackwood entered an order certifying that he had "sufficiently familiarized [himself] with the record in this matter" and would preside over the remainder of the trial.

On appeal, the appellant contends that Judge Dailey should have declared a mistrial. Specifically, the appellant argues that Rule 25(a) of the Tennessee Rules of Criminal Procedure was inapplicable in the instant case because the trial judge was living and not indisposed by illness or other disability. The State responds that the determination as to what qualifies as a "disability" rests

-19-

within the discretion of the court and that the court's decision should not be reversed absent an abuse of that discretion.

Rule 25(a) of the Tennessee Rules of Criminal Procedure provides:

> If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or who may be assigned to the court, upon certifying that he or she has become familiar with the record of the trial, may proceed with and finish the trial.

The question before this court is whether a death in the presiding judge's immediate family qualifies as a "disability" under Rule 25(a).

Rule 25 of the Tennessee Rules of Criminal Procedure is identical to its federal counterpart. See Tenn. R. Crim. P. 25, Advisory Commission Comments. As in Tennessee, Rule 25 of the Federal Rules of Criminal Procedure fails to provide a definition of the term "disability." See Fed. R. Crim. P. 25; United States v. Jaramillo, 745 F.2d 1245, 1249 (9th Cir. 1984). Thus, the federal counterpart also fails to provide us with guidelines as to what constitutes a "disability" under Rule 25.

Although failing to define "disability," Rule 25 specifically provides for a trial to proceed in the event of the death or sickness of the trial judge. Jaramillo, 745 F.2d at 1249. As the Court of Appeals for the Ninth Circuit noted in Jaramillo, 745 F.2d at 1249,

> Neither death nor a disabling sickness necessarily affects the integrity of all prior proceedings in the trial. . . . [I[f the record is free of any problems caused by the judge's disability which affects the integrity of the trial to date, another judge who has familiarized himself with the record may readily take over and finish the trial.

In Jaramillo, 745 F.2d at 1246, the trial judge declared a mistrial after the testimony of three of the prosecution's witnesses upon learning that he had been indicted by a federal grand jury. The defendant filed a motion to bar retrial on double jeopardy grounds, arguing that "'[t]here was no manifest necessity for declaring a mistrial.'" Id. at 1247. The defendant asserted that prior to exercising his discretion to declare a mistrial, the trial judge was obligated to consider less drastic alternatives, namely the alternative provided under Rule 25(a) of the Federal Rules of Criminal Procedure which would have allowed another judge to preside over the remainder of trial. Id. at 1249. The motion was denied. Id. at 1247. On appeal, the court of appeals concluded that Rule 25(a) did

not provide a practical or feasible alternative in that case because "the 'disability' directly implicate[d] the character and integrity of the judge especially in relation to criminal proceedings, the designation of another judge would not remove the appearance of partiality concerning all prior rulings and all actions of the indicted judicial officer, from the inception of trial." Id.

In the instant case, after opening statements but prior to the State's case-in-chief, Judge Dailey suffered a death in his immediate family. Finding that the death constituted a "disability" under Rule 25(a), Judge Dailey announced that he was unable to preside over the remainder of the trial and that Judge Blackwood had been assigned to the court by the Administrative Office of the Courts and the Tennessee Supreme Court. Prior to commencing with trial, Judge Blackwood certified that he had "sufficiently familiarized [himself] with the record in this matter."

Under these circumstances, we conclude that the substitution of judges in the instant case was proper under Rule 25(a) of the Tennessee Rules of Criminal Procedure. Both Judge Dailey and Judge Blackwood complied with the requirements of Rule 25(a). Moreover, Judge Blackwood heard the evidence in its entirety, presiding over the trial from the State's case-in-chief. We also conclude that the death of an immediate family member constitutes a "disability" under Rule 25(a). Unlike being indicted on criminal charges, the death of an immediate family member does not affect the integrity of the trial by calling into question the character of the presiding judge. We further note that Rule 25 does not specify that it is limited to the death or illness of the judge. Accordingly, we conclude that contrary to the appellant's contentions, Rule 25(a) provided for the substitution of judges in the instant case.

Regardless, a mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial court cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court and that decision will not be overturned on appeal absent a clear abuse of that discretion. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). The burden of establishing the necessity for a mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). As the State correctly notes, the appellant failed to allege any miscarriage of justice resulting from the substitution of judges in the instant case. Accordingly, we conclude that Judge Dailey did not abuse his discretion by not declaring a mistrial. This issue is without merit.

## III. Venue

Next, the appellant contends that the evidence was insufficient to establish Shelby County as the proper venue for the prosecution of the victim's murder.[2] Specifically, the appellant argues that the State failed to present evidence that the killing occurred in Shelby County, noting that the victim's body was discovered in a field in Fayette County. The appellant also contends that the trial court erred by failing to instruct the jury on the issue of venue. The State maintains that because the element of premeditation was committed in Memphis, Shelby County was the proper venue.

## A. Sufficiency

Article I, section 9 of the Tennessee Constitution provides that in all criminal prosecutions by indictment or presentment, the accused has a right to a speedy, public trial by an impartial jury of the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18. Proof of venue is necessary to establish the court's jurisdiction. See Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964); Hopson v. State, 299 S.W.2d 11, 14 (Tenn. 1957). However, because venue is not an element of the offense, the State need only prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. See Tenn. Code Ann. § 39-11-201(e) (1997); State v. Bennett, 549 S.W.2d 949, 949-50 (Tenn. 1977); State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). Venue may be proved by circumstantial evidence, and even slight evidence is sufficient if it is uncontradicted. Bennett, 549 S.W.2d at 950. In determining venue, the jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

Rule 18(b) of the Tennessee Rules of Criminal Procedure provides that "[i]f one or more elements of an offense are committed in one county and one or more elements in another, the offense may be prosecuted in either county." See also Tenn. Code Ann. § 39-11-103(d) (1997). First degree murder is defined, in pertinent part, as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1999).

In the instant case, the evidence at trial established that while visiting his niece in Memphis, the appellant learned that the police were looking for him. After abandoning the Ford Bronco he had stolen from a storage building in Mississippi, the appellant carjacked the victim in midtown Memphis. In his statements to police, the appellant claimed that he carjacked the victim because he "needed a way to get out of town." The appellant stated that he drove "east 'till we got to Airways. When we got to Airways, I knowed where I was at then. We went to Airways around to [Interstate] 240. I went around Memphis to [Interstate] 40 going to Nashville and hit [Highway] 64 while I was going out that

---

[2]On appeal, the appellant does not challenge the venue in Shelby County for the offenses of theft of property over $1,000 and especially aggravated kidnapping.

way." The appellant subsequently killed the victim and hid her body in a field. Although the victim's body was discovered in Fayette County, the appellant believed that he had hidden the body in Shelby County, informing police officers that he "dumped her off out there in Shelby County." Regardless, this court has previously acknowledged that, although the victim's body was discovered in a different county, venue was properly found in the county where the defendant first calculated his design to kill the victim. See Cagle v. State, 507 S.W.2d 121, 130-31 (Tenn. Crim. App. 1973). Based upon the evidence, we conclude that the jury could have reasonably inferred that the premeditation and intent to kill the victim was formed while in Shelby County. Accordingly, we conclude that the State proved by a preponderance of the evidence that one or more elements of the murder occurred in Shelby County. This issue is without merit.

## B. Instruction

Contrary to the appellant's assertion, the trial court provided the following instruction relative to venue:

> It is therefore incumbent upon the state before you convict the defendant to establish, to your satisfaction *beyond a reasonable doubt*, that the crime charged in the indictment has been committed, *that the same was committed within the county of Shelby and the state of Tennessee before the finding and returning of the indictment* and that the defendant at the bar committed the crime in such a manner that would be make him guilty under the law heretofore defined and explained to you.

(Emphasis added). While this instruction is materially different from the pattern jury instruction found at T.P.I.- Crim. No. 2.05,[3] the instruction provided that the jury had to find that the offense occurred in Shelby County, Tennessee. The instruction erroneously elevated the State's burden of proof to that

---

[3]Tennessee Pattern Jury Instruction 2.05 provides:

> The burden is upon the state to prove by a preponderance of the evidence that this offense was committed in [_____] County, Tennessee.
>
> Proof by a preponderance of the evidence means that the greater weight of the evidence must be in support of the state's contention.
>
> Venue of the offense lies in the county where the offense was commenced or consummated.
>
> If you find that the state has failed to prove by a preponderance of the evidence that this offense was commenced or consummated in [____] County, Tennessee, then you must return a verdict of not guilty.

of "beyond a reasonable doubt"; thus, any error by the trial court inured to the appellant's benefit. Moreover, because the appellant failed to object to the jury instruction and failed to request any special instructions on the issue of venue, even though, as the appellant asserts, the lack of venue was one of his theories of defense, the issue is waived. See Tenn. R. App. P. 36(a). Finally, we note that the mere meagerness of an instruction does not constitute reversible error in the absence of a special request for an additional instruction. See State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986) (citing State v. Rollins, 605 S.W.2d 828, 832 (Tenn. Crim. App. 1980)). Accordingly, the appellant is not entitled to relief on this ground.

## IV. Sufficiency of the Evidence

Next, the appellant challenges the evidence supporting his conviction of first degree murder. Specifically, the appellant argues that the evidence was insufficient to justify a rational trier of fact in finding beyond a reasonable doubt that the killing was premeditated. The appellant does not challenge the sufficiency of the evidence with regard to his convictions for especially aggravated kidnapping and theft of property over $1,000.

When an appellant challenges the sufficiency of the convicting evidence, this court is guided by certain well-established principles. First, a jury conviction removes the presumption of innocence with which a defendant is cloaked at trial and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). Moreover, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). These rules apply to findings of guilt predicated upon direct evidence, circumstantial evidence, or both direct and circumstantial evidence. State v. Wilson, 924 S.W.2d 648, 649 (Tenn. 1996).

The appellant was convicted of premeditated first degree murder, which is defined as "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the State, the evidence at trial established that in order to avoid apprehension by police, the appellant carjacked the victim in midtown Memphis. He drove around the city and then to a secluded, rural area with which he was familiar. In his statements to police, the appellant admitted to killing the victim, hiding her body in a field under pieces of tin, and fleeing in her vehicle. The appellant also admitted that at the time of the carjacking, he had two guns concealed in his boots. The appellant subsequently directed officers to the location of the victim's body. Dr. Smith testified that the victim died as a result of a stab wound to the back, which wound was 5.77 inches in depth and penetrated the victim's aorta and left lung. The blade of the knife broke off in the victim's chest cavity. Dr. Smith also noted that the victim had bruising about the face, neck, and right thigh, which bruising occurred less than two hours prior to death.

These facts, which include use of a deadly weapon upon an unarmed victim, driving the victim to a remote location, and concealing the victim's body under pieces of tin, coupled with the appellant's motive of eluding arrest, support the jury's finding of premeditation. Accordingly, we conclude that the evidence was sufficient to support the appellant's conviction of premeditated first degree murder. This issue is without merit.

## V. Introduction of Photographs of the Victim

During its case-in-chief, the State introduced twelve color photographs of the victim taken during her childhood and one 8 X 11 color photograph of the victim as an adult. The photographs of the victim during her childhood included: (1) a photograph of the victim with the Easter bunny; (2)

a photograph of the victim with Santa Claus; (3) a photograph of the victim with an infant; (4) a photograph of the victim with her family at Graceland; (5) a photograph of the victim with her family on New Year's; and (6) a photograph of the victim at what appears to be her fifth birthday party. Additionally, a photograph of the victim taken during the autopsy was introduced through the testimony of the medical examiner. The photograph depicted the victim's body severely bruised and covered with debris. On appeal, the appellant argues the trial court erred by admitting the photographs of the victim taken during her childhood and the autopsy photograph.

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that ruling will not be overturned on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant photographs may be excluded if their probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 951.

### A. Childhood Photographs

The appellant asserts that the trial court erred by admitting the photographs of the victim taken during her childhood. Specifically, the appellant argues that these photographs had minimal relevance at trial and that the prejudicial impact of the photographs far outweighed any probative value. The State responds that these photographs were particularly relevant as "they were the catalyst for the [appellant's] confession and decision to lead investigators to the victim's body."

At trial, FBI Special Agent Sturgis explained that, in an attempt to discover the location of the victim, he

> pulled out an envelope that had some pictures of Hillary from the past. One of the Mississippi Highway Patrol investigators had received some photos in the mail from the family in the Chicago area. It showed her from about the age of two on through . . . the years. I pulled . . . the photographs out and put them on top of the envelope, set them on the picnic table and then just basically ignored them for awhile. And after awhile, the conversation led to "She was a pretty child – she was such a pretty child, and it's just a shame that we can't find her." Then we let it go for awhile - let it sit. Then the conversation led to, "If we could just get her body back that the family could be resolved and it was

-26-

coming up on Christmas time – it was a very difficult time for the family, and if she was lying out somewhere, the animals might be getting to her, and that would just be so sad."

The appellant returned to his cell for a short period, then returned and ultimately revealed the location of the victim's body.

While the photographs of the victim as a child corroborated Agent Sturgis' testimony regarding the appellant's ultimate confession of the location of the victim's body, we are hesitant to conclude that the introduction of the photographs was not prejudicial. In fact, we are reluctant to conclude that the use of the photographs to corroborate Agent Sturgis' testimony was necessary. Although the photographs were vital to attaining the appellant's decision to lead authorities to the victim's body, testimony alone satisfied proof of this fact. Moreover, we conclude that the photographs taken throughout the victim's childhood had the distinct probability of appealing to the emotions of the jury. Thus, the danger of these photographs misleading the jury was great. Accordingly, we conclude that the introduction of these photographs was error. Notwithstanding, in light of the overwhelming evidence of guilt, we conclude that the error was harmless. See Tenn. R. App. P. 52(a).

### B. Autopsy Photograph

The appellant also challenges the admission of the autopsy photograph of the victim. At trial, the trial court admitted the photograph over defense counsel's objection, finding:

the photograph is not one of the – it's with her face down, although it contains bruising and what appears to the court to be bruising. It's not – she is clothed with the exception of the area above her - by her shoulders. It shows one stab wound. The court finds nothing really gruesome in the photograph.

Assuming that Dr. Smith is going to testify that this is the wound that caused the death, it would be illustrative of the wound and would be probative as to his expert opinion as to what caused her death.

On appeal, the appellant argues that the trial court should have excluded the photograph because it was gruesome and not probative of any contested issue in the case. The appellant further argues that any probative value was substantially outweighed by the danger of unfair prejudice. According to the appellant, the medical examiner's testimony and an x-ray depicting the knife blade embedded in the victim's chest were sufficient to illustrate the mortal wound. The State maintains that the photograph established premeditation, corroborated the testimony of the medical examiner, and

proved the victim's death as well as the manner in which she died. The State also argues that because the photograph was not particularly gruesome or horrifying, the appellant was not unfairly prejudiced. We agree with the State.

Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Banks, 564 S.W.2d at 950-51. Moreover, photographs can be relevant if they aid the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn. 1997) (holding that photographs were relevant to supplement the testimony of the medical examiner and investigative officers in showing the cause of death and the violence of the attack). However, the probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence. Banks, 564 S.W.2d at 951.

We conclude that the admission of the photograph in the instant case was not error. The photograph in question depicted the victim's body face-down on a table at the morgue. The stab wound can be seen in the upper left portion of her back; thus, the photograph was relevant to supplement the testimony of the medical examiner in establishing the cause of death. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994). Although the photograph showed extensive bruising to the victim's upper back, the photograph was not particularly gruesome. Moreover, the photograph did not show the victim's body to be in an altered condition due to the autopsy. Accordingly, we are unable to conclude that the trial court abused its discretion in ruling that the probative value of the photograph in question was not substantially outweighed by the risk of unfair prejudice. This claim is without merit.

## VI. Admission of Victim Impact Evidence

During the penalty phase of the appellant's trial, the State sought to introduce victim impact evidence through the testimony of Dr. Ronald Sundstrom, a professor of philosophy at the University of Memphis, and Nancy McPike, the victim's mother. At a jury-out hearing, Dr. Sundstrom testified regarding the impact of the victim's murder upon the faculty and students in the Philosophy Department. He related that the victim's murder "brought everything to a halt." According to Dr. Sundstrom, the students and faculty were "devastated" and "huddled together to weep." Moreover, many students were unable to complete their studies, and one student "dropped out." Dr. Sundstrom also testified regarding the victim's duties and responsibilities as his teaching assistant and explained that as a result of the victim's murder, the department had difficulty grading the work of the victim's students.

Mrs. McPike testified that the murder had an "enormous" impact on the victim's family. Mrs. McPike related that the victim had encouraged her to return to college, but that as a result of the murder she had found it difficult to complete her undergraduate degree. She further related that the

victim's brother also had difficulty in school and the victim's father was unable to continue in his endeavors to start a new business. Mrs. McPike testified that the victim's best friend and two of her former boyfriends found it difficult "to cope with her death," and the victim's best friend had sought therapy, fearing she would take her own life. Mrs. McPike also testified that the victim's aunts, uncles, and grandmothers "all struggle[d] to understand how to get up each day and go on without [the victim]."

At the conclusion of the testimony, the trial court allowed the State to introduce the foregoing victim impact testimony, finding that "the testimony is basically related to the emotional and psychological impact that [the victim's murder] had on [her] family and friends and colleagues." The trial court further found that the probative value of the testimony outweighed any prejudicial effect.

On appeal, the appellant submits that the victim impact evidence presented in the instant case went beyond the impact of the victim's murder on her immediate family. He further argues that the evidence had little, if any, relevance, and that the probative value was outweighed by unfair prejudice. Essentially, the appellant contends that the trial court erred by admitting the victim impact evidence which, according to the appellant, clearly exceeded the scope of evidence authorized in State v. Nesbit, 978 S.W.2d 872, 889 (Tenn. 1998).

Neither the United States Constitution nor the Tennessee Constitution prohibits the use of victim impact evidence in a capital sentencing proceeding. State v. McKinney, 74 S.W.3d 291, 308-09 (Tenn. 2002) (citing Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991)). However, the introduction of such evidence is not unrestricted. State v. Berry, 141 S.W.3d 549, 589 (Tenn. 2004) (Appendix). "Victim impact evidence may not be introduced if (1) it is so unduly prejudicial that it renders the trial fundamentally unfair, or (2) its probative value is substantially outweighed by its prejudicial impact." Id. (citing Nesbit, 978 S.W.2d at 891).

Our supreme court has provided guidance as to the nature and extent of evidence that may be admitted as "victim impact" evidence:

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

Nesbit, 978 S.W.2d at 891 (citations omitted); see also State v. Reid, 91 S.W.3d 247, 280 (Tenn. 2002). "[T]here is no bright-line test, and the admissibility of the specific types of victim impact

evidence must be determined on a case-by-case basis." Nesbit, 978 S.W.2d at 891. However, "such evidence . . . should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the emotions or sympathies of the jury." McKinney, 74 S.W.3d at 309.

In the instant case, the testimony of the victim's mother regarding the impact of the murder on the victim's family was clearly of the nature contemplated by Nesbit. See State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999). The fact that the death of a loved one is devastating requires no proof. Berry, 141 S.W.3d at 589 (citing State v. Morris, 24 S.W.3d 788, 813 (Tenn. 2000) (Appendix)). However, Nesbit envisions the impact of the death upon "members of the victim's immediate family." See Nesbit, 978 S.W.2d at 891. Accordingly, we conclude that Mrs. McPike's testimony regarding the impact of the murder on the victim's friends was admitted in error.

Moreover, in light of our supreme court's decision in McKinney, we conclude that Dr. Sundstrom's testimony regarding the impact of the victim's murder on the students and faculty in the Philosophy Department at the University of Memphis was admitted in error. In McKinney, 74 S.W.3d at 309-10, our supreme court sanctioned the admission of victim impact evidence introduced by a fellow police officer of the victim. However, the officer related only factual information regarding the victim's career as a police officer, including his duties, functions, and type of work. Id. The police officer did not testify regarding the impact of the victim's death on himself, other officers, society, or the Memphis Police Department. Id. at 310. Likewise, we conclude that, while Dr. Sundstrom's testimony regarding the victim's duties as a teaching assistant was properly admitted as victim impact evidence, his testimony regarding the impact of the victim's murder upon students and faculty should have been excluded.

Notwithstanding, erroneously admitted victim impact evidence does not mandate reversal when the admission of that evidence can be construed as harmless error. See State v. Smith, 857 S.W.2d 1, 14 (Tenn. 1993) (citing State v. Payne, 791 S.W.2d 10, 19 (Tenn.1990)). Before this court can find that the victim impact testimony admitted during the sentencing phase was "harmless error," we must first conclude, beyond a reasonable doubt, that the sentence would have been the same absent such evidence. See State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993). In making this determination, this court may properly consider the quantity of victim impact evidence admitted at the sentencing hearing and the emphasis placed upon this evidence by the State in its closing argument. See id.

As previously noted, Mrs. McPike's testimony regarding the impact of the murder upon the victim's family and Dr. Sundstrom's testimony regarding the victim's duties as a teaching assistant were properly admitted as victim impact evidence. We further note that in its closing arguments the State did not overemphasize the erroneously admitted impact testimony. Indeed, the State limited its reference to victim impact evidence to the following statements: "Dr. Sundstrom and Nancy McPike took the stand and testified about the emotional and psychological impact of Hillary Johnson's murder in those two communities. That is not – that is not an aggravating circumstance for you to consider." Moreover, the trial court properly instructed the jury regarding aggravating and mitigating

-30-

circumstances and victim impact evidence. In light of these circumstances and the jury's finding of three aggravating circumstances outweighing the mitigating circumstances, we conclude that any error in admitting victim impact evidence was harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

## VII.  Instruction as to (i)(2) Aggravator

Our supreme court has recognized that certain felony offenses, specifically aggravated assault, do not necessarily involve the use of violence. State v. Powers, 101 S.W.3d 383, 400 (Tenn.2003); State v. Sims, 45 S.W.3d 1, 11-12 (Tenn. 2001). In Sims, 45 S.W.3d at 11-12, the court approved a procedure for determining whether the statutory elements of a prior felony conviction involved the use of violence against the person for the purposes of Tennessee Code Annotated section 39-13-204(i)(2). The court held that, if the statutory elements of a felony may be satisfied either with or without proof of violence, the trial court must examine, outside the presence of the jury, the facts underlying the felony to determine whether the offense involved the use of violence. Id.; see also Powers, 101 S.W.3d at 400. If the trial court finds that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence of the conviction. Powers, 101 S.W.3d at 400-01. The trial court then would instruct the jury that the prior conviction involved the use of violence to the person. Id.

In the instant case, prior to the penalty phase, the State advised the court that it was relying on the appellant's prior convictions of robbery with a deadly weapon, rape, kidnapping, and manslaughter to establish the existence of the (i)(2) aggravating circumstance. The trial court conducted a hearing outside the presence of the jury to determine whether the appellant's prior convictions involved the use of violence to the person. Finding that the offenses involved the use of violence, the trial court allowed the State to introduce evidence of the prior convictions and then instructed the jury that in attempting to prove the existence of the (i)(2) aggravating circumstance, "[t]he [S]tate is relying upon the crimes of robbery first-degree, robbery with a deadly weapon, kidnaping, manslaughter, and rape, *which are felonies, the statutory elements of which involve the use of violence to the person.*" (Emphasis added).

On appeal, the appellant contends that the question of whether prior offenses involved the use of violence was a question for the jury to resolve beyond a reasonable doubt. Essentially, the appellant complains that the procedure set forth in Sims, in which the trial court considers the underlying facts of the prior offenses to determine whether the elements of the offenses involved the use of violence to the person, violates the dictates of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002).

Our supreme court recently rejected this same argument in State v. Detrick Cole, No. W2002-01254-SC-DDT-DD, slip op. at 11-16 (Tenn. at Jackson, Jan. 20, 2005) (Birch, J., concurring and

-31-

dissenting). In Cole, slip op. at 15 (quoting Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531, 2536 (2004)), our supreme court acknowledged that "Apprendi and its progeny preclude judges from finding 'additional facts,' that increase a defendant's sentence beyond the 'statutory maximum,' which is defined as the maximum sentence a judge may impose '*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*.'" However, the court held that "[t]he Sims procedure involves a legal determination, and as such this procedure does not transgress the dictates of Apprendi and its progeny." Id. The court explained,

> The (i)(2) aggravating circumstance requires only that the *statutory elements* of the prior felony involve the use of violence to the person. The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence.

Id. (citation omitted). The supreme court further noted that "by making this legal determination, the trial court neither inflicts punishment nor usurps or infringes upon the jury's role as fact-finder." Id. The court observed that "[o]nce the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (i)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt." Id. at 15-16. Accordingly, this issue is without merit.

## VIII. Sufficiency of (i)(6) Aggravating Circumstance

At trial, the State relied upon the aggravating circumstance that the murder was committed to avoid prosecution or lawful arrest. See Tenn. Code Ann. § 39-13-204(i)(6). In support of this factor, the State presented evidence that the appellant was "running from the law in Mississippi." Indeed, the appellant's statements to the authorities provided that it was because of his desire to avoid arrest that he "jumped into" the victim's vehicle. However, on appeal, the appellant contends that this proof was insufficient to establish application of the (i)(6) aggravating circumstance beyond a reasonable doubt. Specifically, the appellant submits that it was not sufficient "to simply prove that at the time of this offense the defendant was in the process of avoiding prosecution for an earlier, unrelated offense in another state."

Our supreme court has previously held that to establish the applicability of the (i)(6) aggravating circumstance, the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing. State v. Bush, 942 S.W.2d 489, 504 (Tenn. 1997) (citing State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993)). "[T]he desire to avoid arrest or prosecution need not be the sole motive, so long as it is one of the motives in the killing." State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000); see also Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001).

In the instant case, abundant proof existed that the appellant killed the victim to avoid apprehension. In his statements to police, the appellant admitted that at the time he carjacked the victim, he "needed a way to get out of town and . . . took her and her car." The appellant then drove the victim to a secluded area where he killed her and hid her body in a manner in which it was unlikely to be discovered. Thereafter, the appellant fled the state in the victim's vehicle. The jury was entitled to weigh the evidence and determine whether the State had established beyond a reasonable doubt that the appellant murdered the victim to avoid arrest and/or prosecution. We conclude that the evidence was sufficient to support the jury's finding. Accordingly, this issue is without merit.

## IX. Constitutionality of Tennessee Death Penalty Scheme

Next, the appellant raises numerous challenges to the constitutionality of Tennessee Code Annotated sections 39-13-204 and 39-13-206 under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution. Specifically, the appellant argues that (A) Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants; (B) the death sentence is imposed capriciously and arbitrarily; and (C) the appellate review process in death penalty cases is constitutionally inadequate.

### A. Failure to Meaningfully Narrow the Class of Death Eligible Defendants

The appellant argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-2-204(i)(2), (i)(5), (i)(6), and (i)(7), individually and collectively, "have been so broadly and disparately interpreted that they fail to provide a 'meaningful basis' for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death." As the State correctly notes, factor (i)(5) does not pertain to this case as it was neither relied upon by the State nor found by the jury. Thus, any individual claim with respect to this factor is without merit. See, e.g., State v. Hall, 958 S.W.2d 679, 715 (Tenn. 1997); State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994). Moreover, the appellant's argument with regard to factors (i)(2), (i)(6), and (i)(7) has previously been rejected by our supreme court. See State v. Vann, 976 S.W.2d 93,117-18 (Tenn. 1998) (Appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

B. The Death Sentence Is Imposed Capriciously and Arbitrarily

Next, the appellant argues that the death sentence is imposed capriciously and arbitrarily because (1) unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty; (2) the death penalty is imposed in a discriminatory manner based upon race, geography, and gender; (3) the jury is required to unanimously agree to a life verdict in violation of McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227 (1990), and Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988); and (4) the failure to instruct the jury on the meaning and function of mitigating circumstances results in the reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances. Our supreme court has rejected each of these arguments. See State v. Hines, 919 S.W.2d 573, 582 (Tenn.1995); Brimmer, 876 S.W.2d at 87; State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993); State v. Thompson, 768 S.W.2d 239, 250-52 (Tenn. 1989).

C. The Appellate Review Process in Death Penalty Cases Is Constitutionally Inadequate

Finally, the appellant contends that the appellate review process in death penalty cases is constitutionally inadequate. Specifically, the appellant contends that the review process is not "meaningful" and that the statutorily mandated proportionality review violates due process. Both arguments have been rejected by our supreme court. See Vann, 976 S.W.2d at 118-19; Cazes, 875 S.W.2d at 270-71. Moreover, the supreme court has held that, "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997).

## X. Review Pursuant to Tennessee Code Annotated Section 39-13-206(c)

This court is required by Tennessee Code Annotated section 39-13-206(c)(1)(D) and the mandates of Bland, 958 S.W.2d at 661-74, to consider whether the appellant's sentence of death was disproportionate to the penalty imposed in similar cases. See State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984)). "If a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001) (quoting Bland, 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the instant case with cases involving similar defendants and similar crimes. Id.; see also Terry v. State, 46 S.W.3d 147, 163 (Tenn. 2001). We select only from those cases in which a capital sentencing hearing was actually

-34-

conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000); see also Godsey, 60 S.W.3d at 783. We begin with the presumption that the sentence of death is proportional to the crime of first degree murder. See Terry, 46 S.W.3d at 163 (citing Hall, 958 S.W.2d at 799). However, this presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 308, 107 S. Ct. 1756 (1987)).

In comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. Id. at 164. Regarding the circumstances of the crime itself, numerous factors are considered including: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706 (citing Bland, 958 S.W.2d at 667); see also Terry, 46 S.W.3d at 164. Also contemplated within the review are numerous factors regarding the defendant, including: (1) the defendant's prior criminal record; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, and physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's level of remorse; (7) the defendant's knowledge of the victim's helplessness; and (8) the defendant's potential for rehabilitation. Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." See generally Terry, 46 S.W.3d at 164. Thus, our function is not to limit our comparison to those cases where a death sentence "'is perfectly symmetrical,'" but rather, our objective is only "'to identify and to invalidate the aberrant death sentence.'" Id. (quoting Bland, 958 S.W.2d at 665).

In light of the relevant and comparative factors, we note that the evidence in the instant case demonstrates that the unsuspecting and unarmed victim was carjacked by the armed appellant, forced to relinquish control of her vehicle, and then murdered by the appellant. The appellant, while attempting to evade law enforcement officials, encountered the victim in midtown Memphis and commandeered her vehicle. At some point, the appellant inflicted a mortal stab wound to the victim's upper left back and hid her body in a remote location in Fayette County, Tennessee. The medical examiner testified that the stab wound, alone, was fatal. The appellant then fled the state in the victim's vehicle, traveling through Georgia, Alabama, and Florida, ultimately returning to Mississippi where he abandoned the vehicle. Less than four miles from the abandoned vehicle, in Hardeman County, Tennessee, the appellant was apprehended at the home of a former girlfriend. Initially, the appellant denied that he inflicted any harm to the victim. However, he subsequently stated that if any harm had come to the victim, he was the person responsible. The appellant has prior convictions involving violence to the person.

Having compared the circumstances of the instant case with similar first degree murder cases, we conclude that the penalty imposed in the instant case was not disproportionate to the penalty imposed in similar cases. The appellant has prior convictions involving violence to the person. The death sentence has been upheld based solely upon aggravating circumstance (i)(2), prior violent felony convictions. See, e.g., State v. McKinney, 74 S.W.3d 291, 313 (Tenn. 2002) (prior conviction for aggravated robbery as adult and aggravated assault as juvenile); State v. Chalmers, 28 S.W.3d 913, 919 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175, 184 (Tenn. 2000) (prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6, 21 (Tenn. 1999) (prior convictions for robbery and first degree murder). Our supreme court has described the prior violent felony factor as an aggravating circumstance that is "'more qualitatively persuasive and objectively reliable than others.'" McKinney, 74 S.W.3d at 313 (quoting State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993)).

We further acknowledge that the death penalty has been upheld in cases where the same or similar aggravating circumstances were found to outweigh any mitigating circumstances. See, e.g., State v. Adkins, 725 S.W.2d 660 (Tenn. 1987) (death sentence upheld based upon (i)(2) and (i)(6) aggravating circumstances); State v. Teague, 645 S.W.2d 392 (Tenn. 1983), on remand, 680 S.W.2d 785 (Tenn. 1984) (death sentence upheld based upon (i)(2) and (i)(6) aggravating circumstances). Additionally, the death penalty has been upheld in cases with similar circumstances. See, e.g., State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (defendant carjacked victim by knife-point, stabbed victim, and left body in remote location; death sentence upheld based upon (i)(5) and (i)(6) aggravating circumstances); State v. Coe, 655 S.W.2d 903 (Tenn. 1983) (defendant abducted eight-year-old victim, raped her, stabbed her, and left her body in remote location; death sentence upheld based upon (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances).

Our review of these cases reveals that the sentence of death imposed by the jury in the instant case was proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and conclude that the sentence of death was not imposed arbitrarily; the evidence supports the finding of the (i)(2), (i)(6), and (i)(7) statutory aggravators; the evidence supports the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt; and the sentence was not excessive or disproportionate.

## XI. Conclusion

Having fully reviewed the record and the applicable authority, we affirm the appellant's conviction of first degree murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and conclude that the sentence of death was not imposed arbitrarily and that the evidence supports the jury's finding of the statutory aggravating circumstances and the jury's finding that the aggravating circumstances outweighed any

mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C). Moreover, a comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the sentence of death imposed by the trial court.

_____

NORMA MCGEE OGLE, JUDGE